**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| UIP Limited, L.L.C., an Arizona limited liability company,<br><br>    Plaintiff/Counterdefendant,<br><br>vs.<br><br>Lincoln National Life Insurance Company, an Indiana corporation,<br><br>    Defendant/Counterclaimant. | No. CV09-0006-PHX-NVW<br><br>**FINDINGS OF FACT, CONCLUSIONS OF LAW, and ORDER** |

    Plaintiff UIP Limited, L.L.C. ("UIP") and Defendant Lincoln National Life Insurance Company ("Lincoln"), as successor-in-interest to Jefferson-Pilot Life Insurance Company ("Jefferson-Pilot"), seek a declaratory judgment as to the interpretation of a prepayment premium provision in a non-recourse promissory note signed by UIP in exchange for a loan from Jefferson-Pilot. The parties originally submitted cross-motions for summary judgment (doc. ## 52, 60). However, the parties have stipulated to a bench trial in accordance with the waiver of jury trial in the promissory note and on the evidence now before the Court. Therefore, the motions will be treated as trial briefs, and the Court has heard the arguments of counsel. This order states the Court's findings of fact and conclusions of law in accordance with Fed. R. Civ. P. 52(a).

1 **I.     Facts**

2          The following facts are entirely or almost entirely undisputed, but to the extent the
3 facts may be subject to any reasonable dispute, this constitutes the Court's findings of
4 fact.  On or around September 13, 1999, Dale and Dawn Zeitlin signed a Purchase and
5 Sale Agreement for the purchase of commercial real estate in Tempe, Arizona.  In order
6 to finance the purchase, the Zeitlins obtained loan quotes from two lenders, Jefferson-
7 Pilot and Minnesota Mutual Life Insurance.  Both quotes included a prepayment penalty
8 equal to "yield maintenance."  On September 21, 1999, and again on September 27, 1999,
9 Dale Zeitlin applied for a loan from Jefferson-Pilot on behalf of Zeitlin Limited, L.L.C.
10 ("Zeitlin Limited").  The Mortgage Loan Application specified that prepayment options
11 would be "[c]losed for 7 years; standard yield maintenance thereafter; open last 90 days."
12 At that time, Mr. Zeitlin understood "yield maintenance" to mean that in the event of
13 prepayment of the loan, Jefferson-Pilot would still get the contract rate of return on the
14 loan.

15          On October 15, 1999, Jefferson-Pilot signed a Loan Approval, approving a loan to
16 Zeitlin Limited in the amount of $2,900,000, prepayment of which would be closed for
17 seven years, "open to prepayment thereafter at the greater of 1% of the principal loan
18 balance or yield maintenance," and open for the last 90 days of the loan term.  On
19 October 25, 1999, both Dale and Dawn signed a Mortgage Loan Commitment,
20 committing Zeitlin Limited to the loan subject to several changes and clarifications, none
21 of which pertained to prepayment of the loan.  Exhibit C of the Mortgage Loan
22 Commitment delineates the "Prepayment Privilege," which would require Zeitlin Limited
23 to pay a prepayment premium that, together with the amount prepaid, would be
24 "sufficient to invest in a U.S. Treasury obligation for the remaining term of the Loan to
25 produce the same effective yield to maturity as the Loan."  The provision further specifies
26 that the prepayment premium will be the greater of:

27          (1)   one percent (1%) of the then outstanding principal balance of the Loan,
                  or
28

>     (2) the sum of the present value of the scheduled monthly payments on the
>     Loan from the date of prepayment to the maturity date minus the
>     outstanding principal Loan Balance as of the date of prepayment. The
>     present value will be computed on a Monthly basis as of the date of
>     prepayment, discounted at the "Treasury Yield". . . .

Neither Dale nor Dawn Zeitlin objected to the prepayment premium provision at the time they signed the Mortgage Loan Commitment.

On November 18, 1999, Zeitlin Limited changed its name to UIP Limited, L.L.C. ("UIP"). On December 8, 1999, Dawn Zeitlin, on behalf of UIP, signed a promissory note ("Note") drafted by Jefferson-Pilot. The Note specifies that UIP will repay to Jefferson-Pilot a loan in the amount of $2,800,000 plus interest at a contract rate of 8.1% per annum. The loan is to be repaid over fifteen years based on a twenty-five year amortization schedule. Provision 1 of the Note states that Plaintiff is obligated to repay the principal and interest as follows:

>     (a) Commencing on the first day of February, 2000 (the "First Payment Date")
>     and on the first day of each month thereafter until this Note matures, principal
>     and interest in consecutive equal installments of . . . $21,797.00 (the initial
>     payment and each subsequent payment shall each hereinafter be referred to as
>     "Monthly Payment"); and
>
>     (b) On January 1, 2015 (the "Maturity Date"), the entire unpaid principal
>     amount, together with accrued and unpaid interest thereon, and all other sums
>     due under this Note or under any other documents evidencing or securing this
>     Note (collectively, the "Loan Documents"), shall be due and payable in full.
>
>     . . . interest due on the First Payment Date shall be calculated on the
>     basis of the actual number of days elapsed between the Disbursement Date and
>     the First Payment Date. If the interest due and accrued on the First Payment
>     Date is more or less than one month, the Monthly Payment due on the First
>     Payment Date shall be increased or decreased to the extent that the amount of
>     interest then due exceeds or is less than one month's interest.

Finally, the "Prepayment" provision, found in Exhibit B to the Note, states that UIP is prohibited from prepaying the Note for seven years from the date of the Note. Thereafter, UIP may prepay the Note in full so long as it pays a prepayment premium and gives Jefferson-Pilot notice of a prepayment date. The prepayment premium is calculated as follows:

>     The Prepayment Premium shall be the greater of (a) one percent (1%) of the
>     outstanding principal balance of the Note on the Prepayment Date, or (b) the
>     remainder of (i) the sum of the present values (determined using periodic

> monthly intervals and a discount rate equal to the Treasury Yield) of the then remaining unpaid Monthly Payments due under this Note to the Maturity Date minus (ii) the outstanding principal balance of this Note as of the Prepayment Date. The "Treasury Yield" is the yield in percent per annum of the Treasury Constant Maturities for the length of time from the Prepayment Date to the Maturity Date . . . .

The prepayment premium is therefore equal to the greater of the 1% amount under subsection (a) or the amount derived from the formula under subsection (b).

On November 26, 2008, Dale Zeitlin sent written notice to Jefferson-Pilot of UIP's election to prepay the outstanding balance of the loan, together with interest, "assuming that the prepayment premium is in the amount of 1% of the outstanding principal balance on January 1, 2009." Zeitlin stated that it was UIP's understanding that the "principal balance at that time will be in the approximate amount of \$2,347,608.69, which means that the prepayment premium is \$23,476.09." UIP's understanding was based on a subsection (b) calculation that did not include the final balloon payment of \$1,810,394.78 as of a January 1, 2009 pay-off date. The subsection (b) formula therefore produced a negative number. On December 3, 2008, Jefferson-Pilot responded that UIP's understanding was incorrect, and that the amount under subsection (b) was higher than the amount under subsection (a). Jefferson-Pilot's calculation under subsection (b) included the final balloon payment of \$1,810,394.78 within the definition of "Monthly Payments." That calculation produced a prepayment premium of \$678,000 as of a January 1, 2009 pay-off date.

The following additional facts pertaining to the operation of the prepayment provision are also undisputed. First, a calculation of the prepayment premium under subsection (b) involves a Treasury Yield discount rate, also known as a Constant Maturity Treasury rate ("CMT"). CMTs are reported by the Federal Reserve Statistical Release. As of a pay-off date of January 1, 2009, if the final balloon payment is not included in the calculation under subsection (b)(i), the premium is negative for all positive CMTs and all negative CMTs from 0% to -3%. Exclusion of the balloon payment therefore means that the premium in subsection (b) will only be greater than the 1% premium in subsection (a)

when the CMT is lower than -3%. Since the Federal Reserve Statistical Release began to report CMTs in 1962, CMTs have never been reported as negative. On the other hand, if the balloon payment is included in the calculation, the 1% premium in subsection (a) is higher when the CMT is above or very close to the contract rate of 8.1%. When the CMT is below the contract rate, for example 5%, the premium in subsection (b) is higher than the 1% premium in subsection (a).

Second, if the balloon payment is included in the calculation of the premium under subsection (b) and the prepaid amount, together with the premium under subsection (b), is reinvested at a commercial loan market rate very close to the contract rate of 8.1% for the remaining term of the loan, Lincoln will earn more than it would have earned on the contract had the loan not been prepaid. On the other hand, if the balloon payment is included in the calculation and the prepaid amount, together with the premium under subsection (b), is reinvested in a treasury obligation for the remaining term of the loan at the same rate used to calculate the premium, Lincoln will earn almost exactly what it would have earned on the contract had the loan not been prepaid.

Finally, if the balloon payment is excluded from the calculation under subsection (b) and the prepaid amount, together with 1% premium under subsection (a), is reinvested at a commercial loan market rate very close to the contract rate of 8.1% for the remaining term of the loan, Lincoln will earn close to what it would have earned on the contract had the loan not been prepaid. On the other hand, if the balloon payment is excluded from the calculation under subsection (b) and the prepaid amount, together with the 1% premium under subsection (a), is reinvested in a treasury obligation for the remaining term of the loan at the same rate used to calculate the premium, Lincoln will earn roughly $757,000 less than what it would have earned on the contract had the loan not been prepaid.

## II. Analysis

The parties dispute the interpretation of subsection (b) of the prepayment premium formula, which ultimately boils down to a dispute over the meaning of the term "Monthly Payment" in the Note. Lincoln, relying on evidence of the parties' intent and prior negotiations, argues that the term includes the final balloon payment. UIP, relying solely on the language of the Note, maintains that the term "Monthly Payment" does not include the final balloon payment due on the maturity date. Alternatively, UIP argues that if Lincoln's interpretation is correct, the prepayment premium is an unenforceable penalty and is unconscionable.

### A. Interpretation of the Note's Prepayment Provision

Provision 20 of the Note specifies that the Note is "governed by and construed in accordance with the laws of the state in which the property is located . . . ." Because the subject property is located in Arizona, the Note is governed by and construed in accordance with Arizona law. When construing an agreement under Arizona law, a court must give effect to the intent of the parties at the time the agreement was made. *Taylor v. State Farm Mut. Auto. Ins. Co.*, 175 Ariz. 148, 153, 854 P.2d 1134, 1139 (1993); *Sam Levitz Furniture Co. v. Safeway Stores, Inc.*, 105 Ariz. 329, 331, 464 P.2d 612, 614 (1970). Before *Taylor*, courts looked only to the plain meaning of the words "as viewed in the context of the contract as a whole" in order to ascertain the parties' intent. *United Cal. Bank v. Prudential Ins. Co. of Am.*, 140 Ariz. 238, 259, 681 P.2d 390, 411 (Ct. App. 1983). If the meaning of the disputed language could be determined from the four corners of the contract and could not "reasonably be construed in more than one sense," extrinsic evidence was irrelevant and inadmissible. *Id.* at 258, 681 P.2d at 410. In other words, an ambiguity in the meaning of the contract language had to exist before extrinsic evidence was even considered.

In *Taylor*, however, the Arizona Supreme Court decided that ambiguity in the contract language is not necessary to consider extrinsic evidence of the parties' intent for purposes of interpreting the contract language. 175 Ariz. at 154, 854 P.2d at 1140.

- 6 -

1 Rather, in accordance with the Corbin view of contract interpretation, a court must now
2 "first consider[] the offered evidence and, if [it] finds that the contract language is
3 'reasonably susceptible' to the interpretation asserted by its proponent, the evidence is
4 admissible to determine the meaning intended by the parties." *Id.* at 154, 854 P.2d at
5 1140. This approach recognizes that a term that appears to be plain and unambiguous on
6 its face is not so plain and unambiguous in light of extrinsic evidence of the parties'
7 intent. *Id.* It is based on the principle that although extrinsic evidence is not admissible
8 to vary or contradict the terms of a contract, it is admissible to interpret a contract. *Id.* at
9 152, 854 P.2d at 1138.

10   *Taylor* therefore requires courts to engage in a two-step process when interpreting
11 disputed contract language. First, the court decides whether the contract language is
12 reasonably susceptible to more than one meaning in light of all evidence of the parties'
13 prior negotiations, understandings, and other extrinsic evidence of the parties' intent. *Id.*
14 at 153, 154, 854 P.2d at 1139, 1140; *see also Long v. City of Glendale*, 208 Ariz. 319,
15 328, 93 P.3d 519, 528 (Ct. App. 2004). Whether the language is reasonably susceptible
16 to multiple interpretations is a question of law. *Taylor*, 175 Ariz. at 158-59, 854 P.2d at
17 1144-45. A court must "apply a standard of reasonableness" to contract language and
18 must construe the contract "in its entirety and in such a way that every part is given
19 effect." *State ex rel. Goddard v. R.J. Reynolds Tobacco Co.*, 206 Ariz. 117, 120, 75 P.3d
20 1075, 1078 (Ct. App. 2003). Therefore, the contract should be interpreted, if possible, "in
21 a way that does not render parts of it superfluous." *Taylor*, 175 Ariz. at 158 n.9, 854 P.2d
22 at 1144 n.9.

23   In the second step, the court decides whether to admit the extrinsic evidence based
24 on its determination of whether the contract is reasonably susceptible to the proponent's
25 interpretation. *Id.* at 154, 854 P.2d at 1140; *Long*, 208 Ariz. at 328, 93 P.3d at 528. If
26 the language is reasonably susceptible to that interpretation, the court should admit the
27 extrinsic evidence to ascertain the parties' intended meaning. *Id*. On the other hand, if
28 the court finds that the language is not reasonably susceptible to that interpretation, it

must exclude any extrinsic evidence that varies or contradicts the meaning of the contract language as written. *Id.*

### 1. **Extrinsic Evidence of the Parties' Intent**

Evidence of the parties' prior negotiations, understandings, and other extrinsic evidence indicates that Jefferson-Pilot intended to provide for a prepayment premium based on standard yield maintenance, and that UIP was well aware of that intent. The loan quote from Jefferson-Pilot states that the prepayment premium would be equal to "yield maintenance." The Mortgage Loan Application specifies that prepayment options would be "[c]losed for 7 years; standard yield maintenance thereafter; open last 90 days." The Loan Approval indicates that the prepayment premium would be "the greater of 1% of the principal loan balance or yield maintenance."

Yield maintenance prepayment provisions are "nothing new." *River E. Plaza, L.L.C. v. Variable Annuity Life Ins. Co.*, 498 F.3d 718, 721 (7th Cir. 2007) (citing Dale A. Whitman, *Mortgage Prepayment Clauses: A Legal and Economic Analysis*, 40 UCLA L. REV. 851, 871 (1993)). Their purpose is to compensate the lender for any loss on return when the borrower opts to prepay the loan during a time when the market rate is lower than the contract rate of return. *Id.*; Whitman, *supra*, at 860. The intended goal of a yield maintenance formula is to produce a prepayment premium, which, together with the amount prepaid, allows the lender to earn the same yield on reinvestment as it would have if the borrower had not prepaid and had made all scheduled payments over the life of the loan.

Throughout the loan negotiations, UIP understood "yield maintenance" to mean that in the event of prepayment of the loan, Jefferson-Pilot would still get the contract rate of return on the loan. UIP maintains that there was no mutual understanding as to what vehicle or interest rate would be used for reinvestment of the prepaid amount and the premium, but the Mortgage Loan Commitment very clearly states that the prepayment premium, together with the amount prepaid, must be "sufficient to invest in a U.S. Treasury obligation for the remaining term of the Loan to produce the same effective

yield to maturity as the Loan." There is nothing to suggest that UIP did not have ample opportunity to review the Mortgage Loan Commitment before signing it. Therefore, the parties contemplated a prepayment premium which, together with the amount prepaid, would be sufficient to earn the same amount upon reinvestment in a treasury obligation for the remaining term of the loan as it would have earned if the loan had not been prepaid. It is in light of this evidence that the Court must decide whether the prepayment premium formula in the Note is reasonably susceptible to Lincoln's interpretation.

**2.     The Language of the Prepayment Premium Formula**

The prepayment premium formula, outlined in Exhibit B to the Note, states:

> The Prepayment Premium shall be the greater of (a) one percent (1%) of the outstanding principal balance of the Note on the Prepayment Date, or (b) the remainder of (i) the sum of the present values (determined using periodic monthly intervals and a discount rate equal to the Treasury Yield) of the then remaining unpaid Monthly Payments due under this Note to the Maturity Date minus (ii) the outstanding principal balance of this Note as of the Prepayment Date . . . .

The language of subsection (b) therefore requires a person calculating the prepayment premium to subtract the outstanding principal balance, as of some designated prepayment date, from the sum of the present values of the "unpaid Monthly Payments due under this Note to the Maturity Date."

The terms "Monthly Payments" and "Maturity Date" are defined in provision 1 of the Note, which states that the principal and interest are payable as follows:

> (a) Commencing on the first day of February, 2000 (the "First Payment Date") and on the first day of each month thereafter until this Note matures, principal and interest in consecutive equal installments of . . . $21,797.00 (the initial payment and each subsequent payment shall each hereinafter be referred to as "Monthly Payment"); and
>
> (b) On January 1, 2015 (the "Maturity Date"), the entire unpaid principal amount, together with accrued and unpaid interest thereon, and all other sums due under this Note or under any other documents evidencing or securing this Note (collectively, the "Loan Documents"), shall be due and payable in full.

It is undisputed that the "Maturity Date" is January 1, 2015, and that in the event the loan is not prepaid, provision 1(b) requires UIP to make a final balloon payment of the outstanding principal, plus interest, on that date.

The dispute centers on the term "Monthly Payment." If subsection (b) operates as the parties contemplated, the premium under subsection (b) should be higher than the 1% premium under subsection (a) whenever the CMT is below the contract rate. This would compensate Jefferson-Pilot for the loss on the contract discounted by what Jefferson-Pilot could earn if it reinvested the prepaid loan and premium in a treasury obligation at the lower CMT rate. For subsection (b) to achieve that desired result, the final balloon payment must be included in the present value calculation, because if it is not, the 1% premium in subsection (a) is always higher for all positive CMTs and all negative CMTs from 0% to -3%. Therefore, the dispute boils down to whether the term "Monthly Payment" is reasonably susceptible to an interpretation that would include the final balloon payment.

"Monthly Payment" is defined as "the initial payment and each subsequent payment . . . ." It is undisputed that "initial payment" refers to the first payment to be made on February 1, 2000, the "First Payment Date." Lincoln argues, however, that "each subsequent payment" can reasonably be interpreted to include the final balloon payment, because the final payment is literally a subsequent payment, albeit not one of the equal installments of $21,797. This argument is persuasive considering only the definition of "Monthly Payment," because the balloon payment is literally a payment to be made subsequent to the initial payment, and it too is due on the first day of the month (January 1, 2015).

However, the inquiry cannot end there. The interpretation must be reasonable, not merely possible or plausible. A determination of reasonableness requires the term to be considered within the context of the Note as a whole, because the Note must be construed in its entirety and in a way that gives effect to all parts. The language immediately surrounding the definition of "Monthly Payment" suggests that the term does not include the final balloon payment. The definition is included within a provision that deals exclusively with consecutive *equal* installments of $21,797 that are due on the first day of each month. The fact that the definition of "Monthly Payment" immediately follows the

- 10 -

description of the equal installments strongly suggests that the term was intended to describe only the equal installments of $21,797 each. The final balloon payment is plainly not one of the equal installments.

Lincoln argues, however, that the language directly below provision 1(b) indicates that "Monthly Payment" cannot be interpreted to mean only equal installments. That language states:

> . . . interest due on the First Payment Date shall be calculated on the basis of the actual number of days elapsed between the Disbursement Date and the First Payment Date. If the interest due and accrued on the First Payment Date is more or less than one month, the Monthly Payment due on the First Payment Date shall be increased or decreased to the extent that the amount of interest then due exceeds or is less than one month's interest.

According to the above language, the first payment may be slightly higher or slightly lower than $21,797, depending on whether more or less than one full month elapses between the disbursement date and the first payment date. Lincoln maintains that because the initial payment may be slightly higher or lower than the subsequent installments of $21, 797, the term "Monthly Payment," which includes "the initial payment," cannot refer only to *equal* installments of $21,797. This argument, while correct in a technical sense, is not without its flaws, because it provides no answer to the fact that the definition of "Monthly Payment" appears in a provision that deals exclusively with equal monthly installments of $21,797. In addition to that problem, the final balloon payment is described in an entirely separate provision from the one that includes the definition of "Monthly Payment." While "Monthly Payment" is defined in provision 1(a), the final balloon payment is described in provision 1(b), suggesting that these two amounts were intended to be mutually exclusive.

Lincoln relies on *Fishman v. LaSalle Nat'l Bank*, 247 F.3d 300 (1st Cir. 2001), to support its position. Like this case, *Fishman* involved a dispute over the correct interpretation of a prepayment premium provision in a promissory note. *Id.* at 301. In pertinent part, the provision stated:

> "Prepayment Premium" . . . shall be the greater of (a) one percent (1%) of the outstanding principal balance of the Note, or (b) a Yield Maintenance

> Prepayment Premium . . . equal to the product of (i) the outstanding principal balance due hereunder (including accrued interest) at the time of prepayment multiplied by (ii) the "Monthly Interest Differential" (as hereinafter defined), and (iii) discounted by the "Treasury Yield" . . . rate over the number of months then remaining to the end of the fifth Loan Year.

*Id.* The borrower read the formula to require a single calculation involving the outstanding balance, while the lender read the formula to require a series of month-to-month calculations determining the present value of what the lender would lose in the event of prepayment. *Id.* at 302. The district court ruled in favor of the lender, relying on a commitment letter that illustrated the operation of the formula using a series of monthly calculations rather than a single calculation. *Id.* The district court also based its conclusion on the fact that the borrower's interpretation would render some terms superfluous. *Id.* The First Circuit affirmed, noting that "the meaning of the prepayment terms taken as a whole is not ambiguous once the calculations themselves are fully understood." *Id.* The court emphasized that the lender's interpretation made sense because it "carrie[d] out what one might imagine to be a plausible objective of parties so situated . . . ." *Id.*

In *Fishman*, the court interpreted the prepayment premium formula in a way that gave effect to the lender's intent to provide for yield maintenance. Evidence of the parties' intent supported the lender's interpretation, because the commitment letter included a precise example of how the formula worked, which likely dispelled most if not all of the ambiguity in the provision. The lender's interpretation was also reasonable in light of the language of the prepayment provision as a whole, because it did not require the court to expand the meaning of a defined term. The ambiguity was inherent in the meaning of a few undefined words.

In this case, the textual evidence of the parties' intent from the Note alone is not as clear. The evidence shows that the parties contemplated a yield maintenance provision, but the Note alone does not speak to the parties' specific understanding of whether the calculation of yield maintenance would include the final balloon payment. Furthermore, the language of the prepayment provision in this case is not as open to Lincoln's

- 12 -

interpretation as the *Fishman* provision was open to the lender's interpretation in that case. On the one hand, the definition of "Monthly Payment" in the Note is literally and technically amenable to an interpretation that would include the final balloon payment. On the other hand, the context in which the definition appears suggests that "Monthly Payment" does not include the final balloon payment.

In such a close case, as the *Fishman* court recognized, "[c]ommon sense is as much a part of contract interpretation as is the dictionary or the arsenal of canons." *Fishman*, 247 F.3d at 302. Moreover, "[t]he presumption in commercial contracts is that the parties were trying to accomplish something rational." *Id.* In this case, if the balloon payment is not included in the calculation of the prepayment premium formula under subsection (b), the formula utterly fails to achieve the rational goal of yield maintenance. UIP argues that an exclusion of the balloon payment still enables Lincoln to achieve yield maintenance, because if the prepaid amount, together with 1% premium under subsection (a), is reinvested in a commercial loan at a market rate very close to the contract rate of 8.1% for the remaining term of the loan, Lincoln will earn close to, if not more than, what it would have earned on the contract had the loan not been prepaid. This argument relies on the assumption that the prepaid amount and the premium would be reinvested in a commercial loan bearing an interest rate similar to the contract rate of 8.1%. This assumption, and therefore the argument, is meritless because the Mortgage Loan Commitment clearly indicates that Lincoln intended for the premium, together with the prepaid amount, to be sufficient to earn the same yield if reinvested in a treasury obligation at the treasury rate used to calculate the premium.

As noted, if the balloon payment is excluded from the calculation under subsection (b) and the prepaid amount, together with the 1% premium under subsection (a), is reinvested in a treasury obligation for the remaining term of the loan at the same rate used to calculate the premium, Lincoln will earn roughly $757,000 less than what it would have earned on the contract. Such a result clearly fails to achieve the mutually-intended goal of allowing Lincoln to maintain its bargained-for yield on the contract. If, on the

other hand, the balloon payment is included in the calculation and the prepaid amount, together with the premium under subsection (b), is reinvested in a treasury obligation for the remaining term of the loan, as was contemplated by the parties in the Mortgage Loan Commitment, Lincoln will earn almost exactly what it would have earned on the contract.

Common sense and the goal of giving effect to the parties' intent therefore require the final balloon payment to be included in the calculation under subsection (b), and therefore within the definition of "Monthly Payments."  There is of course a fine line between interpreting the Note and reforming it to say what it could not reasonably be interpreted to say before.  *See Long*, 208 Ariz. at 329, 93 P.3d at 529 ("As *Taylor* recognizes, . . . one cannot claim that one is 'interpreting' a written clause with extrinsic evidence if the resulting 'interpretation' unavoidably changes the meaning of the writing . . . ."); *see also* 5-24 CORBIN ON CONTRACTS § 24.18 ("[R]eformation is sought because although the parties have assented to the very words contained in the document, these words were so ill chosen as to produce an unintended legal effect . . . .").  However, in such a close case, it cannot be said that interpreting the term "Monthly Payment" to include the final balloon payment crosses the line from interpretation to reformation, at least where the parties' actual intention from the negotiations is as explicit and undisputed as it is here.  Therefore, the term "Monthly Payments" in subsection (b) of the prepayment premium formula under the Note includes the final balloon payment due on the maturity date.

**B.** **Enforceability of the Prepayment Premium under Lincoln's Interpretation**

UIP argues that if Lincoln's interpretation is correct, the resulting prepayment premium of $678,000 is unenforceable.  Although unclear in the briefing, UIP appears to be challenging the enforceability of the premium on two grounds: (1) the premium is an unenforceable penalty and (2) the premium is unconscionable.

### 1. The prepayment premium provision cannot be an unenforceable penalty because it is not a liquidated damages provision.

In support of its argument that the resulting premium is an unenforceable penalty, UIP cites to several bankruptcy court decisions in which the enforceability of prepayment premium provisions was analyzed under a liquidated damages framework. *See In re A.J. Lane & Co.*, 113 B.R. 821 (Bankr. D. Mass. 1990); *In re Kroh Bros. Dev. Co.*, 88 B.R. 997 (Bankr. W.D. Mo. 1988); *In re Skyler Ridge*, 80 B.R. 500 (Bankr. C.D. Cal. 1987). Lincoln, on the other hand, relies on several non-bankruptcy decisions to support its argument that the prepayment premium provision is not a liquidated damages provision and therefore should not be analyzed as one. *See Great Plains Real Estate Dev., L.L.C. v. Union Cent. Life Ins. Co.*, 536 F.3d 939 (8th Cir. 2008); *West Raleigh Group v. Mass. Mut. Life Ins. Co.*, 809 F. Supp. 384 (E.D.N.C. 1992); *Ridgley v. Topa Thrift & Loan Ass'n*, 73 Cal. Rptr. 2d 378, 953 P.2d 484 (1998); *Carlyle Apartments Joint Venture v. AIG Life Ins. Co.*, 333 Md. 265, 635 A.2d 366 (1994).

Arizona law recognizes that "[t]he traditional role of liquidated damages provisions is to serve as an economical alternative to the costly and lengthy litigation involved in a conventional breach of contract action . . . ." *Pima Sav. & Loan Ass'n v. Rampello*, 168 Ariz. 297, 299, 812 P.2d 1115, 1117 (Ct. App. 1991). Therefore, it follows that a contract provision is a liquidated damages provision only if it is triggered by an event that qualifies as a breach of the contract. If a party is merely exercising an alternative method of performance provided for in the contract, there is no breach of the contract. *See Great Plains*, 536 F.3d at 945.

Depending on how they are drafted and the facts of a particular case, prepayment provisions may be triggered either by the borrower's exercise of a contractual right to prepay or by the borrower's attempt to pay after default and acceleration. Prepayment provisions often allow the borrower to pay off the loan before the maturity date if the borrower pays a prepayment premium along with the outstanding balance of the loan. *See, e.g., Great Plains*, 536 F.3d at 943; *Atl. Ltd. P'ship-XI v. John Hancock Mut. Life*

1 *Ins. Co.*, 95 F. Supp. 2d 678, 679-80 (E.D. Mich. 2000); *West Raleigh Group*, 809 F.
2 Supp. at 386; *Carlyle*, 333 Md. at 266-67, 635 A.2d at 366-67. The provision is therefore
3 triggered when the borrower exercises the bargained-for right to an alternative method of
4 performance.

5 However, to prevent a borrower from circumventing a prepayment premium, or to
6 compensate a lender in the event of default, prepayment premiums may also be triggered
7 when the borrower attempts to pay off the loan after default and/or acceleration. *See, e.g.,*
8 *In re CP Holdings, Inc.*, 332 B.R. 380, 382-83 (W.D. Mo. 2005) (prepayment premium
9 triggered by acceleration of the note); *A.J. Lane*, 113 B.R. at 822-23 (prepayment
10 premium triggered by borrower's attempt to pay the loan after default); *Kroh*, 88 B.R. at
11 998 (prepayment premium triggered by borrower's default); *Skyler Ridge*, 80 B.R. at 501-
12 02 (prepayment premium triggered by borrower's attempt to pay off the loan after
13 default).

14 This distinction likely explains the divergent conclusions among courts as to
15 whether a prepayment provision should be analyzed as a liquidated damages provision.
16 In all the bankruptcy cases cited by UIP, the prepayment provision appears to have been
17 triggered by the borrower's default. In such cases, the prepayment provision was a
18 liquidated damages clause because it was triggered by a breach of contract. *See Kroh*, 88
19 B.R. at 999 (recognizing that liquidated damages clauses attempt to forecast harm caused
20 by a breach of the contract). However, even in those cases, at least one court has
21 expressed doubt as to whether prepayment provisions should be analyzed as liquidated
22 damages clauses. *See Skyler Ridge*, 80 B.R. at 503 ("The classification of the prepayment
23 premium language as a liquidated damages provision is not altogether certain. However,
24 the parties have agreed upon this characterization . . . .").

25 On the other hand, in almost all the cases cited by Lincoln, the provision was
26 triggered by the borrower's decision to exercise a contractual option to prepay the loan.
27 The liquidated damages analysis was ill-suited to these cases because there was no breach
28 of contract. *See Great Plains*, 536 F.3d at 945 (declining to treat a prepayment provision

1  as a liquidated damages clause because when plaintiff chose to prepay, it "was not
2  breaching the contract but was in fact acting in accordance with an express option
3  provided under the contract"); *West Raleigh Group*, 809 F. Supp. at 391 (deciding that the
4  prepayment premium was the "bargained-for consideration for the option to prepay, and
5  as such . . . enforceable as a matter of contract law and not as a measure of damages");
6  *Carlyle*, 333 Md. at 270, 635 A.2d at 368 (concluding that the facts did not "engage the
7  gears of . . . law relating to liquidated damages" because the plaintiff complied with the
8  terms of the prepayment provision and did not breach the contract). As some non-
9  bankruptcy courts have acknowledged, the bankruptcy context is distinguishable because
10 it almost always involves a breach of contractual payment obligations and it requires
11 prepayment provisions to be assessed with competing creditors' claims in mind. *See*
12 *Norcrest, Inc. v. Collateral Mortgage Capital LLC*, No. 06-6025-CV-SJ-HFS, 2008 WL
13 4279595, at *1, 2008 U.S. Dist. LEXIS 68834, at *3 (W.D. Mo. Sept. 11, 2008) ("The
14 bankruptcy context, where there is a breach of payment obligations, is not identical to a
15 situation where, as here, a prepayment occurs pursuant to contractual provisions."); *Atl.*
16 *Ltd. P'ship-XI*, 95 F. Supp. 2d at 684 ("Bankruptcy courts approach the issue of
17 prepayment premiums from a different perspective . . . .").
18     In this case, the prepayment provision gives UIP the option to prepay the loan so
19 long as it pays a prepayment premium. However, the provision also requires UIP to pay a
20 premium if it defaults and attempts to pay the outstanding balance upon acceleration.
21 Therefore, the provision in this case may be triggered by the voluntary choice to prepay
22 the loan, or by a breach of the Note followed by acceleration. Whether the provision
23 should be treated as a liquidated damages clause could be affected by whether the
24 provision was crafted primarily to provide an alternative method of performance or
25 primarily to compensate for loss associated with a breach. Here, the provision was
26 clearly intended to provide UIP with an alternative method of performance, because it
27 starts out by stating that "Maker may prepay this Note in whole . . . provided Maker gives
28 Holder . . . written notice . . . and pays a prepayment fee . . . ." Much later, the provision

goes on to state that an attempt by UIP to pay off the loan after default and acceleration "shall be presumed to be and conclusively deemed to constitute a deliberate evasion of the prepayment provisions . . . and shall therefore be subject to the Prepayment Premium . . . ." The goal of allowing the premium to be triggered by default was not primarily to compensate Lincoln for damages from involuntary default, but rather to remove the incentive for UIP to evade the premium. Furthermore, in this case, the provision was triggered by UIP's election to prepay the loan. It was not triggered by a default or other breach of the terms of the Note. Therefore, the provision is not a liquidated damages provision and is not subject to the analysis governing unenforceable penalties.

**2.     The prepayment premium is not unconscionable.**

UIP argues in the alternative that the $678,000 prepayment premium under Lincoln's interpretation is unconscionable. This argument fails for several reasons. First, UIP has provided no legal authority or facts to support an argument that the prepayment premium in this case would be unconscionable. Second, as other courts have recognized, prepayment of a loan is not a right or an obligation, but rather an optional contractual privilege given to the borrower by the lender. *See Norwest Bank Minn., N.A. v. Blair Rd. Associates, L.P.*, 252 F. Supp. 2d 86, 97 (D.N.J. 2003) ("Under New Jersey law unless the note gives the borrower the right to prepay the loan, the borrower is obliged to pay the full amount of the interest that he would have to pay over the term of the loan."); *Northway Lanes v. Hackley Union Nat'l Bank & Trust Co.*, 334 F. Supp. 723, 732 (W.D. Mich. 1971) ("[A]bsent agreement to the contrary, the lender has a right to refuse prepayment altogether and to insist that a note and interest be paid according to its terms . . . ."). The prepayment premium cannot be unconscionable where UIP can simply avoid it by continuing to pay off the loan to maturity. *See id.*

IT IS THEREFORE ORDERED that the parties' cross-motions for summary judgment (doc. ## 52, 60), converted to a bench trial upon stipulation of the parties, are

1  decided in favor of Defendant Lincoln National Life Insurance Company and against
2  Plaintiff UIP Limited, L.L.C.

IT IS FURTHER ORDERED that the Clerk enter final judgment declaring that the term "Monthly Payments" in the promissory note includes the final balloon payment due on the maturity date, such that the present value of the final balloon payment is included in the calculation under subsection (b) of the prepayment premium formula in the promissory note. The Clerk shall terminate this action.

DATED this 30th day of November, 2009.

_____
Neil V. Wake
United States District Judge